UNITED STATES of America

v.

Bernard WATSON, Defendant.

No. 93 CR 716.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 5, 1994.

George C. Howard, Jr., Chicago, IL, for defendant.

Jerome Nathan Krulewitch, U.S. Attorney's Office, Chicago, IL, for the U.S.

*MEMORANDUM OPINION
AND ORDER*

BRIAN BARNETT DUFF, District Judge.

This case comes before this court on a motion to suppress oral admissions and a written confession by the defendant, Bernard Watson. For the reasons stated below, this court grants the motion to suppress because of a *Miranda* violation.

*BACKGROUND*

Bernard Watson is before this court for his alleged involvement in the armed robbery of a federal armored truck on September 8, 1992 in Chicago. Watson was indicted based upon three counts: conspiracy to commit robbery in violation of 18 U.S.C. § 1951, knowingly using and carrying a firearm in relation to a crime of violence in contravention of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2, and interfering with the Federal Bureau of Investigation's investigation of the case in violation of 18 U.S.C. § 111.

After suspecting Watson's involvement in the crime, two law enforcement officers went to Watson's home more than one year after the robbery. He accompanied them to a police station. At some time during the 8 hours that Watson spent in the presence of the officers, he allegedly made certain admissions and signed a written statement confessing his role in the armed robbery. Watson left the agents that day but was arrested several days later for his alleged participation in the armed robbery.

The defendant has moved to suppress admissions made on September 16, 1993 at the crime scene as well as his signed confession. The court held a hearing on this motion to suppress over the course of three days, on March 4, March 7 and March 11, 1994. During the hearing, five witnesses testified: Police Officer Ronald Branum, FBI Special Agent Ronald Hosko, Anthony Daniels, Steve Watson, and the defendant, Bernard Watson.

*INITIAL FINDINGS OF FACT*

The court has heard the evidence and has considered the testimony, exhibits, and arguments of counsel. Now fully advised in this matter, the court initially finds the following facts.

1. Following the robbery of a federal armored truck on September 8, 1992 in Chicago, law enforcement agents began an investigation. During the course of the investigation, the police arrested one of the guards, Randy Ball, who was in the armored car on the day of the robbery. (Tr. 8).

2. Randy Ball told the police that a man by the name of "Juice" was involved in the robbery. (*Id.*) Ball also gave the police the pager telephone number of the person named "Juice".

3. The police subpoenaed telephone records and learned that the telephone number that Ball had given them belonged to Juice Watson who lived at 8522 South Damen in Chicago. (Tr. 71). The police called the pager number and Bernard Watson identified himself. (Tr. 8).

4. A criminal history record revealed that Bernard Watson had been arrested in a vehicle approximately one week after the robbery. (Tr. 8, 72). The police recovered from that vehicle $4,500, a marijuana cigarette, and a cellular telephone. (Tr. 8).

5. The police learned that the vehicle had been purchased one week after the robbery. (Tr. 9). They also discovered that Bernard Watson purchased with cash on the day of the robbery the cellular tele-

phone that the police recovered from the vehicle. Prior to September 16, 1993, the police also learned that numerous local calls were made from the cellular phone on the day of the robbery. (Tr. 9).

6. Sometime before September 16, 1993, the police went to Bernard Watson's home and took a photograph of him as he stood in the doorway of his house. (Tr. at 160).

7. Officer Ronald Branum and Agent Ronald Hosko went to Bernard Watson's home at approximately 7:00 A.M. on September 16, 1993 without first seeking either an arrest warrant or a search warrant (Tr. 31, 112). The officers considered Bernard Watson a suspect in the robbery. (Tr. 8, 110).

8. When the officers arrived at Bernard Watson's home, they told him that they wanted to talk to him in private at the police station. (Tr. 11, 73). Bernard Watson told the officers that first he wanted to put some clothes on since at the time he was dressed in a bathrobe. (Tr. 153, 73, 11). He dressed.

9. Before leaving the house, Bernard Watson called his office to tell them that he would be late for work. (Tr. 11, 76–77).

10. The officer and agent drove Bernard Watson to a nearby police station. Neither Officer Branum nor Agent Hosko were affiliated with that station house. While on the way to the police station, Bernard Watson asked the officers if he was under arrest and they told him he was not. (Tr. 13, 80).

11. At the police station, Officer Branum and Agent Hosko questioned Bernard Watson about the robbery for approximately an hour and a half. (Tr. 15, 38). There was no tape or record by a court reporter of what Bernard Watson said at the police station. (Tr. 46).

12. Officer Branum and Agent Hosko and Bernard Watson left the police station and drove to the scene of the robbery in the agents' car. The officers continued to question Bernard Watson about the robbery during the car ride. (Tr. 88).

13. After visiting the scene of the crime, the officer and agent drove Bernard Watson to the Dirksen Building to continue questioning him about the robbery. In the Dirksen Building Bernard Watson signed a written statement purporting to describe his involvement in the robbery. Watson also signed a Waiver of Rights Form. While in the building, Bernard Watson called his girlfriend and, in the presence of one officer, told her that he expected to be home soon. (Tr. 168, 217).

14. At the Dirksen Building, Bernard Watson spoke with Agent Hosko and the Assistant United States Attorney on the case regarding his cooperation and Watson signed a cooperation agreement. (Tr. 96).

15. The government did not charge Bernard Watson for any crime on September 16, 1993.

16. Bernard Watson left the Dirksen Building on September 16, 1993. Officer Branum and Agent Hosko drove him home at approximately 3 p.m. (Tr. 24, 168).

17. Several days later, the police arrested Bernard Watson for his alleged role in the 1992 robbery. (Tr. at 25).

### ANALYSIS

While the facts of this case are fairly straightforward, we find the legal issues embodied in this motion to be labyrinthine and important. The issues presented here involve the convergence of the Fourth, Fifth and Sixth Amendments of the United States Constitution and the prophylactic rule established by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Events at the hearing on the motion to suppress also raised important issues concerning the impact of the actions of the Assistant United States Attorneys on the credibility of their witnesses. This opinion examines each of these issues in turn.

### I. FOURTH AND FOURTEENTH AMENDMENT ISSUES

In a motion to suppress evidence seized pursuant to an alleged violation of the Fourth Amendment, the allocation of the burden of proof depends upon whether or not a warrant was issued. In federal courts, "[i]f the search or seizure was effected pursuant to a

warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality." *United States v. Longmire,* 761 F.2d 411, 417 (7th Cir.1985). *See also* 3 LaFave, *Search and Seizure* § 11.2(b), at 218 (2nd Ed.1987). The Seventh Circuit explained this warrant-no warrant dichotomy:

> Where the police have acted pursuant to a warrant, the independent determination of probable cause by a magistrate gives rise to a presumption that the arrest or search was legal. But where the police have acted without a warrant, the legality of their action will not be presumed. The dichotomy may be explained, in part, by the often stated preference that searches and seizures be effected pursuant to warrants. Those seeking to invoke an exception to the warrant requirement bear the burden of establishing that the circumstances required dispensing with that requirement. *Longmire,* 761 F.2d at 417.

In this case, the officers did not secure an arrest or search warrant before going to Bernard Watson's home on September 16, 1993. Consequently, the government has the burden of establishing the legality of its actions.

The defendant brings this motion to suppress incriminating oral statements he allegedly made and a written confession that he signed on September 16, 1993 concerning the robbery of an armored car. The defendant alleges that the police violated his constitutional rights protected by the Fourth and Fourteenth Amendments of the United States Constitution and by the Illinois Constitution. The defendant argues that the entry of the police and the arrest of Watson in his home, absent exigent circumstances or consent, violated Watson's rights protected by the Fourth and Fourteenth Amendments and established in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) and its progeny. (Defendant's Petition at ¶ 14). Consequently, Watson argues that subsequent oral and written inculpatory statements should be suppressed as the "fruit of the poisonous tree" pursuant to

*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Id.* at ¶ 15.

The government contends that there was no *Payton* violation because Mr. Watson consented to the police's entry into his home and there was no arrest on September 16, 1993. (Government's Consolidated Br. at 11). The government also claims that the existence of probable cause to arrest Watson and the reading of *Miranda* warnings to Watson prior to his signing of confession cure earlier defects, including the patently clear need for an arrest warrant, pursuant to *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *Id. See also* Government's Supplemental Br. at 2–3.

The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures by the government. U.S. Constitution, Amendment IV. The United States Supreme Court has long held that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court for the Eastern District of Michigan, et al.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The language of the Fourth Amendment makes clear that at the core of this constitutional mandate is the "right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).

■ In the landmark decision of *Payton v. New York, supra,* the Supreme Court held that the Fourth Amendment proscribes the police from making warrantless and non-consensual entry into a home to make a routine felony arrest absent exigent circumstances. Prior to *Payton,* New York and other states authorized police officers to enter a private residence without a warrant and with force, if necessary, to make routine felony arrests. The Supreme Court in *Payton* held that "[t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly

defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their ... houses ... shall not be violated.'" 445 U.S. at 589, 100 S.Ct. at 1382.

In *Payton*, the police broke into the defendants' homes without search or arrest warrants to arrest them for murder and robbery. Once inside, the police seized weapons, narcotics and other incriminatory paraphernalia and used them against the defendants at his trial. The United States Supreme Court overturned the convictions because the police had failed to secure arrest warrants and there were no exigent circumstances nor consent given for the entries and seizures of persons and property. The *Payton* Court distinguished between warrantless searches and seizures inside a home and warrantless searches and seizures in public places. The Court found the former presumptively unreasonable and the latter valid. Id. at 586–87, 100 S.Ct. at 1380–81.

We hold that the *Payton* doctrine does not require this court to suppress the defendant's incriminating statements under the Fourth Amendment. Although *Payton* and *Watson* share some similarities, the differences are significant. As in *Payton*, the police in *Watson* failed to obtain arrest or search warrants before entering the defendant's home. In addition, in *Payton* and *Watson* there were no exigent circumstances to justify warrantless entries into houses.

An important difference between *Payton* and *Watson* concerns the place in which the challenged evidence was seized. In *Payton*, the police searched and seized incriminating evidence found inside the defendants' homes. In *Watson*, the challenged evidence was obtained outside of the defendant's house; Watson reportedly made incriminating statements while at a police station and at the crime scene and he signed a confession in the Dirksen Building. The Court in *Payton* made clear that a person's home was the "zone of privacy" that deserved utmost protection from unreasonable searches and sei-

zures by the government. *Id.* at 589, 100 S.Ct. at 1381–82.

Even if we assume *arguendo* that the police in *Watson*, as in *Payton*, entered the defendant's home absent consent to make a routine felony arrest[1], the *Payton* doctrine would not dictate the suppression of evidence here under the Fourth Amendment. To explain why this is so, the court now turns to the United States Supreme Court's decision in *New York v. Harris. Supra.* In that case, the police violated *Payton* by entering Harris' home without consent or a warrant to arrest him for murder. The trial court suppressed incriminating statements Harris made in his home but admitted a statement Harris made at a police station. 495 U.S. at 16, 110 S.Ct. at 1642. Harris was convicted and the intermediate appellate court affirmed.

The New York Court of Appeals reversed the lower courts in *Harris*. The Court of Appeals accepted the trial court's findings that there was no consent to enter Harris' home and the police had probable cause to arrest the defendant. The Court of Appeals, however, held that under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and its progeny, the statement Harris made at the police station was inadmissible fruit of an illegal arrest made in violation of *Payton*. 495 U.S. at 16, 110 S.Ct. at 1642.

The United States Supreme Court reversed the New York Court of Appeals. The Supreme Court in *Harris* held that although the warrantless arrest of Harris in his home violated *Payton* and the Fourth Amendment, the Constitution did not require suppressing the statement made outside of the home. *Id.* at 21, 110 S.Ct. at 1644–45. The Court stated that the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* at 17, 110 S.Ct. at 1643. The Court explained that the *Payton* rationale would not be served by suppressing

---

1. We explore in detail the issue of whether Watson was "in custody" for the purpose of an arrest in the section of this opinion concerning *Miranda* and the Fifth Amendment.

inculpatory statements made outside of the home:

> The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated. We are not required by the Constitution to go further and suppress statements later made by Harris in order to deter police from violating *Payton* ... If we did suppress the statements like Harris', moreover, the incremental deterrent value would be minimal. *Id.* at 20, 110 S.Ct. at 1644.

The Supreme Court determined nonetheless that Harris' detention outside his home following the illegal arrest was lawful. The Court held that its reasoning in *Payton* did not suggest that "an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house." *Id.* at 18, 110 S.Ct. at 1643. The Court found that Harris' statement taken at the police station was not the product of an unlawful detention because the police had probable cause to arrest him.

The Supreme Court drew an important distinction between *Brown v. Illinois*, cited by the defendant here, and *Harris*. *Brown* "stand[s] for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality ..." *Harris*, 495 U.S. at 18, 110 S.Ct. at 1643.[2] The *Harris* Court distinguished *Brown* and other similar cases based upon the doctrine of probable cause. In *Brown*, the challenged evidence was tainted because the police lacked probable cause to arrest the defendant. *Id.* at 19, 110 S.Ct. at 1643–44. In *Harris*, by contrast, the police had probable cause to arrest the defendant. The *Harris* Court concluded that the defendant's challenged statement was admissible

because it was not an exploitation of the illegal entry into his home. *Id.*

The facts and arguments presented in *Watson* and *Harris* are strikingly similar. Both cases involve *Payton* violations. The defendant's Fourth Amendment argument in *Watson* mirrors the argument that the New York Court of Appeals endorsed in *Harris:* the court should suppress incriminating evidence on the theory that such evidence was the fruit of a non-consensual entry into a home and illegal detention of the defendant in violation of *Payton.* (Defendant's Petition at ¶ 14.) The United States Supreme Court, however, rejected this argument in *Harris* when it found that the police had probable cause to arrest the defendant outside of his home. This court, in turn, must reject the defendant's Fourth Amendment argument in the case at bar if we find that the police had probable cause to detain Mr. Watson.

■ Probable cause to arrest or significantly restrain one's freedom comparable to an arrest exists if under the totality of circumstances it was reasonable for the officer to believe the suspect committed a crime. *See U.S. v. Evans,* 27 F.3d 1219, 1228 (7th Cir.1994).

■ Before the police went to Bernard Watson's home on the morning of September 16, 1993, they had gathered the following information about the 1992 armored car robbery. The police had arrested one of the guards who had been on the truck the day of the robbery. That guard, Randy Ball, told the police that a man by the name of "Juice" was involved in the robbery. Randy Ball gave the police the pager number for "Juice." Subpoenaed telephone records indicated that the subscriber to that pager number was Juice Watson, who lived on South Damen in Chicago. The police confirmed that the Watson family lived at that address. The police also called the pager number. After a brief conversation, they learned that Bernard Watson was the person who returned the call. A criminal history check revealed that approximately one week after the robbery, Bernard

---

**2.** *See U.S. v. Fazio,* 914 F.2d 950, 957 (7th Cir. 1990) for discussion of the "attenuation analysis".

Watson had been arrested for some reason not indicated in the record. Upon arrest, the police recovered from a vehicle purchased within a week after the robbery $4,500 and a cellular phone. The police learned that the cellular phone had been purchased the day of the robbery and calls were made that day in Chicago. We believe the record as a whole supports the finding of probable cause here.

In light of *Harris*, this court will not suppress the defendant's inculpatory oral and written statements under the Fourth Amendment. Even though the police violated *Payton* here, they had probable cause to detain Bernard Watson to the degree associated with an arrest on September 16, 1993. Therefore, the incriminating statements that Watson made outside of his home are admissible under the Fourth Amendment.

Next we turn to *Miranda* and the Fifth Amendment to determine whether the defendant's statements are admissible.

## II. *MIRANDA AND FIFTH AMENDMENT ISSUES*

The Fifth Amendment of the United States Constitution protects individuals in criminal cases from governmental coercion that elicits self-incriminating statements. U.S. Constitution, Amendment V. To guard against abridgement of people's Fifth Amendment rights, the United States Supreme Court in *Miranda v. Arizona* established a prophylactic rule requiring the government to issue specific warnings to individuals subject to custodial interrogation. *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). The Court explained that custodial interrogation means questioning initiated by the government after a person is in custody or otherwise significantly deprived of his freedom. 384 U.S. at 444, 86 S.Ct. at 1612.

The Supreme Court has acknowledged that certain custodial interrogations by their very nature are inherently coercive. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630–31, 81 L.Ed.2d 550 (1984). Custodial interrogation generates enormous pressure on the person being questioned to speak when under other circumstances he would not do so freely. 384 U.S. at 467, 86

S.Ct. at 1624. *Miranda* requires the suppression, from the prosecution's case in chief, statements made during custodial interrogation when the government fails to inform the suspect of his rights articulated by the *Miranda* Court. *Id.* at 479, 86 S.Ct. at 1630.

The Supreme Court explained the relationship between *Miranda* and the Fifth Amendment:

> The *Miranda* exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm. *Oregon v. Elstad*, 470 U.S. 298, 306–07, 105 S.Ct. 1285, 1291–92 (1985) (emphasis in original).

Stated simply, *Miranda* warnings are "not themselves rights protected by the Constitution but were instead measures to insure that the [suspect's] right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

■ *Miranda* does not apply in all coercive situations. Anytime the police interview someone suspected of having committed a crime the atmosphere may be coercive. The Supreme Court has stated that "police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). *Miranda* rights are triggered when the government significantly restricts an in-

dividual's freedom as to render him "in custody" and subjects the person to interrogation. *Id.* Determining custody, however, is a slippery task. *Elstad, supra,* 470 U.S. at 309, 105 S.Ct. at 1293.

## A. "IN CUSTODY" DETERMINATION

Recently the United States Supreme Court explained the custody standard pursuant to *Miranda. Stansbury v. California,* —— U.S. ——, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Although a court must examine all the circumstances surrounding an interrogation, the ultimate inquiry is whether the police formally arrested the suspect or restrained his movement to the degree normally associated with a formal arrest. *Id.* at ——, 114 S.Ct. at 1529. *See also California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. at 713–14. The Court in *Stansbury* stated that the "in custody" determination depends upon the objective circumstances of the interrogation not the subjective views of the interrogating officers or the person being questioned. —— U.S. at ——, 114 S.Ct. at 1529:

> [U]nder *Miranda* "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time;" rather, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. *Id.* quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

The *Stansbury* Court held that an officer's knowledge or beliefs if conveyed to the suspect bear on the custody issue only in so far as the effect those statements may have on how a reasonable person in the suspect's position would gauge the breadth of his freedom. —— U.S. at ——, 114 S.Ct. at 1530. The Court reiterated its long-held conclusion that "any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for the purposes of *Miranda.* *Id.*

This court's analysis of *Miranda* as applied to the instant case must focus on whether at the time Bernard Watson made the incriminating oral and written statements, the police had restrained his freedom to the degree associated with a formal arrest. This inquiry is required because the police had not formally arrested Bernard Watson prior to or during their questioning of him on September 16, 1993 for the armed robbery. This court's analysis must be determined from the perspective of how a reasonable person in Bernard Watson's position would have understood his situation. *See Stansbury, supra,* —— U.S. at ——, 114 S.Ct. at 1529. The Seventh Circuit recently reiterated an earlier holding on this issue:

> "In determining whether the accused was subjected to custodial interrogation, a reviewing court should consider the totality of the circumstances. The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination. *U.S. v. Jones,* 21 F.3d 165, 170 (7th Cir.1994), quoting *U.S. v. Hocking,* 860 F.2d 769, 773 (7th Cir.1988).

This court found the defense witnesses credible. The two defense witnesses who were in the house when the officer and agent arrived on September 16, 1993 maintained high credibility under effective direct examination and vigorous cross examination. The testimony of Steve Watson and Anthony Daniels quite clearly did not sound rehearsed and their answers were straightforward and consistent. These witnesses came across as responsible, intelligent and candid.

After reviewing the entire record, we additionally find the following facts:

1. When Officer Branum and Agent Hosko arrived at the Watson home on September 16, 1993, they knocked on the door and a man answered the door. The officers identified themselves as the police and that they wanted to talk to Bernard Watson. The man closed the door.

2. Within a few minutes, Bernard Watson opened the front door. The officers again identified themselves and informed Bernard Watson that they wanted to talk to him in private. They entered the home.

The police told Bernard Watson that they wanted him to accompany them to the police station.

3. Bernard Watson told the officers that he wanted to get dressed. He left the officers in the living room and he walked to his bedroom to change clothes.

4. Without invitation, the officers followed Bernard Watson to his bedroom. One officer entered Watson's bedroom after Watson while the other officer stood in the doorway. The only two exits from Bernard Watson's bedroom were through the doorway and out the window. The officer in Bernard Watson's bedroom looked around the room and in Watson's closet. While this occurred, one of Bernard Watson's two roommates stood in the hallway and listened to the events in Bernard Watson's room.

5. At some point while the officers were in the house, Bernard Watson went into the bathroom. Officer Branum followed Watson to the bathroom door and watched Watson through the open door. Bernard Watson closed the bathroom door so he could wash up and the officer opened the door and stood in the doorway.

6. Bernard Watson asked the officers if they could talk to him at his house rather than at the police station. As Bernard Watson and the other two defense witnesses testified, at least one officer said "you're either going to come easy or you're going to come hard." (Tr. at 158. See also Tr. at 124, 138, 154–55, 176).

7. Bernard Watson, Officer Branum and Agent Hosko left the house and got into the officers' car.

■ After reviewing the entire record and weighing the credibility of the witnesses, we hold that Bernard Watson was "in custody" from the moment the officers reached Watson's bedroom. This conclusion is supported by the actions of the officers and the effect those actions would have, we believe, on a reasonable person in the defendant's position. The officers followed Watson to his bedroom without his consent and one entered Watson's bedroom while the other stood in the doorway. One officer followed Watson to the bathroom and prevented Watson from keeping the door closed as Watson washed up. The whole time the officers were in the house, at least one officer stuck closely by Watson, never letting him out of their sight. Finally, the officers insisted that Watson accompany them to the police station saying he could go the easy way or the hard way. We believe that a reasonable person in the defendant's position would have felt that the officers had significantly curtailed his freedom to the degree associated with an arrest.

This court did not overlook two important facts in reaching its conclusion that the defendant was "in custody" for the purposes of *Miranda*. We recognize that at no time that day did the officers place handcuffs on the defendant or pat him down. Moreover, we understand that the officers told Watson during the ride to the police station that he was not under arrest. One need not be in handcuffs or under arrest, however, to be "in custody" for the purposes of *Miranda*. We find that the officers actions at Watson's home support the conclusion of this court.

We also find that the totality of the record indicates that the defendant remained "in custody" until the police drove him home at 3 p.m. on the afternoon in question. From the moment the officers entered his bedroom until they dropped him off at home eight hours later at least one officer remained with Watson. The officers drove Watson in their car to a nearby police station. The officers did not offer Watson the choice of going to the police station in his own car and at his convenience. They questioned him in the station house about the robbery.

The officers and Watson left the police station and they drove him to the crime scene. The officers assert and Watson denies that he made a series of incriminating comments that were spontaneous, voluntary and without provocation from the officers. The court finds the officers' testimony to be lacking credibility. Nowhere in this record at all or in this hearing did the court gain any impression that the defendant was a "babbling bandit".

The officers continued questioning Watson about the robbery. The officers did not tell him he was free to leave at any time. After-

wards, the officers drove Watson to the Dirksen Building and discussed taking a written statement from Watson about the robbery. The officers did not permit Watson to make a telephone call to his girlfriend in privacy at the Dirksen Building; Officer Branum stood close to Watson and listened to the telephone conversation. After Watson signed a confession, Waiver of Rights form, and a cooperation agreement the officers drove Watson home. This record supports the conclusion of the court that Bernard Watson was "in custody" for the purpose of *Miranda* on September 16, 1993.

Since the defendant was "in custody" at the time the officers questioned him about the robbery, we must next determine if the challenged evidence was obtained in accordance with *Miranda.*

### B. MIRANDA WARNINGS

In this motion to suppress, the defendant challenges incriminating statements he reportedly made at the police station and crime scene as well as his written confession. We will consider separately these admissions pursuant to *Miranda.*

#### 1. ORAL STATEMENTS MADE AT POLICE STATION

■ The government contends that Bernard Watson incriminated himself at the police station. Agent Hosko testified that the defendant agreed to answer some questions about the robbery. (Tr. at 82). According to Hosko, Watson answered the officers' questions and incriminated himself within 45 minutes of arriving at the police station. (Tr. at 83). The defendant denied making any incriminating statements (Tr. at 160); the defendant testified that he told the officers at the station that he knew nothing of the robbery. (Tr. at 196).

Even if we assume *arguendo* that Watson incriminated himself at the station house, we must suppress the defendant's oral statements under *Miranda.* The record reflects that the officers failed to issue *Miranda* warnings to Watson before they questioned him at the police station about the robbery. On cross examination, Detective Branum admitted that Watson was not advised of his

rights under *Miranda* while he was at the station house:

Q. Well, when Mr. Watson, when he first indicated to you in the Green Street police station that he had some information about this alleged robbery, did you at that point tell him, "Now, wait a minute Mr. Watson, you are implicating yourself in a criminal matter, now you have a right to remain silent." Did you do that?

A. No.

Q. Did you tell him at that point that "You have a right to have a lawyer"?

A. No.

Q. Did you tell him that anything he said could be used against him?

A. No.

Q. After he had talked to you for four hours and implicated himself, according to your statements, in this alleged robbery, it was at that time that you warned him about the right to have a lawyer?

A. That's correct. (Tr. 48–49).

As we found earlier, the defendant was "in custody" at the time he was in the police station. The officers testified that the defendant made statements incriminating himself during their interrogation. Since the defendant was subject to custodial interrogation at the police station, *Miranda* required the officers to advise the defendant of his rights. The officers' admitted failure to do so compels this court to suppress the allegedly inculpatory statements the defendant made at the station house.

#### 2. ORAL STATEMENTS MADE EN ROUTE TO THE CRIME SCENE

The government alleges that the defendant incriminated himself about the robbery when the police drove him to the crime scene on September 16, 1993. The government witnesses allege that the defendant made three admissions en route to and at the crime scene: he incriminated himself initially in the car, he offered to go to the scene of the crime and explain what happened, and then he confessed at the scene of the robbery. Bernard Watson denied that he made any incriminating statements en route to or at the crime scene. (Tr. 162).

After reviewing the facts and weighing the credibility of the witnesses, this court is compelled pursuant to *Miranda* to suppress all the statements the defendant made en route to the crime scene. According to Detective Branum and Agent Hosko, they left the police station at approximately 9:15 a.m. with Bernard Watson because of constant interruptions from other officers while they were trying to question the defendant. (Tr. at 16, 46, 84). On direct examination, Agent Hosko responded to a series of leading and suggestive questions by the government. Hosko stated that Detective Branum drove and Hosko took notes and asked more questions during the car ride:

Q. Did you start to drive?

A. No, Detective Branum drove. I had been taking notes throughout the interview, and to *just maintain that continuity* Detective Branum drove, Mr. Watson sat in the back seat and I sat in the passenger side in front and *continued to take notes and ask some questions.* (emphasis added)

Q. For the first few minutes of the ride did you continue to have an answer and question with Bernard Watson as you drove?

A. Yes.

Q. At some point did he indicate that now he was willing to tell you the entire truth?

A. Yes, he did.

Q. Was he indicating his involvement and the involvement of others at this time?

A. Yes, he was.

Q. His role within the robbery?

A. Yes.

Q. And the role of other individuals?

A. Yes. (Tr. at 85–86).

Agent Hosko's testimony indicated that the officers' interrogation of the defendant continued from the police station to the car ride. (Tr. at 85–88).

Agent Hosko's testimony about the officers' questioning of the defendant in the car continued. It is important again to note the leading, compound and suggestive questions by the government on direct examination:

Q. So he indicated essentially that he preferred to go to the west side rather than come downtown to the federal building?

A. That's right.

Q. After this on the drive over did you continue to discuss his involvement?

A. We continued talking about the robbery the whole way.

Q. Was he cooperative?

A. Yes.

Q. Answering your questions?

A. Yes.

Q. Directly?

A. Yes.

Q. Did he ever indicate "Look, I don't want to talk to you anymore"?

A. No. (Tr. at 87–88).

Agent Hosko's testimony indicated that the officers' interrogation of the defendant continued throughout the car ride. Since the defendant was "in custody" and subject to interrogation and was not informed of his rights under *Miranda,* any statements he made during the car ride must be suppressed.

Taking the record as a whole, it appears as though the officers continuously questioned Watson about the robbery throughout the morning of September 16, 1993. They started questioning him at the Green Street police station, continued in the car ride to the crime scene and at the federal building. In fact, Detective Branum testified about continuing the interview with the defendant after visiting the site of the robbery. Note once again the compound, leading and suggestive questions by the government on direct examination:

Q. And at that time, after this discussion did you speak with Mr. Watson about his continuing cooperation?

A. That's correct.

Q. And did Mr. Watson agree to continue to cooperate?

A. Yes, he did.

Q. Did you ask him at that time if he was willing to go to the federal building *to*

*continue the interview?* (emphasis added)

A. That's correct. (Tr. at 18).

Even if we assume *arguendo* that the defendant incriminated himself at the scene of the robbery on September 16, 1993, *Miranda* requires that this court suppress unwarned admissions made during the lengthy and continuous period of interrogation. As we concluded earlier in this opinion, the defendant was "in custody" at the time the officers took him to the crime scene. The record indicates and the government admits (Tr. at 88) that the officers first advised the defendant of his rights protected by *Miranda* at the FBI office in the Dirksen Building. Since the *Miranda* warnings were issued after the reported statements at the crime scene and while the defendant was subject to custodial interrogation, this court will suppress these oral admissions.

### 3. WRITTEN CONFESSION

The government contends that the written confession is admissible because there was no *Miranda* violation involved with that statement even if the earlier oral statements were unwarned. The prosecution asserts that on September 16, 1993 the defendant read and signed an advice of rights and waiver of rights form at the FBI offices in the Dirksen Building. (Government's Supplemental Br. at 2). It was after waiving his *Miranda* rights, the government maintains, that the defendant assisted the officers in preparing a written confession. *Id.* The government argues that since the defendant was advised of his rights before he gave the written confession this court should admit the confession under *Oregon v. Elstad, supra.*

The United States Supreme Court in *Elstad* examined the issue of whether an initial failure of the government to advise a suspect of his *Miranda* rights taints subsequent admissions made voluntarily and with *Miranda* warnings. In *Elstad*, the police went to the defendant's home with a warrant to arrest him for burglary. 470 U.S. at 300, 105 S.Ct. at 1288. The police began questioning the defendant and he incriminated himself. At the police station, the officers issued *Miranda* rights to the defendant and then the defendant provided a written confession. At

trial, defendant moved to suppress the oral and written statements. He argued that the statement he made in response to the questioning at his house "let the cat out of the bag" and tainted the subsequent confession as "fruit of the poisonous tree." *Id.* at 302, 105 S.Ct. at 1289. The trial court suppressed the defendant's initial incriminating statement pursuant to *Miranda* but admitted the written confession. The trial court found the written confession was given freely, voluntarily and knowingly after he had waived his *Miranda* rights and was in no way tainted by the earlier statement. *Id.* The defendant was convicted of burglary.

The Oregon Court of Appeals reversed Elstad's conviction based upon the trial court's failure to suppress the written confession. *Id.* The appellate court analyzed whether there was a sufficient break in the stream of events between the oral and written statements to purge the taint of the initial statement. The appellate court held that the impact of the unconstitutionally obtained oral statement sealed the defendant's fate by "letting the cat out of the bag" and coerced subsequent admissions made within a short period of time. *Id.* at 303, 105 S.Ct. at 1289–90. The Supreme Court of Oregon declined review.

The United States Supreme Court in *Elstad* drew an important distinction between violations of the Constitution and violations of the Court's prophylactic rule established in *Miranda*. *Id.* at 304–05, 105 S.Ct. at 1290–91. The suggestion that the defendant's confession was tainted by the police's failure to give *Miranda* warnings, requiring "fruit of the poisonous tree" analysis pursuant to *Wong Sun* doctrine, assumes the existence of a constitutional violation. *Id.* at 305, 105 S.Ct. at 1291. The Court explained that a procedural *Miranda* violation differs significantly from violations of the Fourth Amendment, which require application of the fruits' doctrine. *Id.* at 306, 105 S.Ct. at 1291. The Court held that "[t]he purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits." *Id.* By contrast, the *Miranda* exclusionary rule serves to protect people against governmental coercion leading

to self-incrimination in violation of the Fifth Amendment. *Id.* The failure to administer *Miranda* creates a presumption of compulsion for which a remedy is available even in the absence of an identifiable constitutional harm. *Id.* at 307, 105 S.Ct. at 1292.

The Supreme Court determined that suppression of the warned and voluntary confession was not required by the Constitution. The Court explained that in the absence of any coercion or improper tactics, there is no need for a broader application of the *Miranda* exclusionary rule to cover properly warned statements made after an earlier *Miranda* violation. *Id.* at 309, 105 S.Ct. at 1293. The Court stated that once a suspect is advised of his rights under *Miranda*, that individual is free to decide whether or not to make a statement to the authorities. *Id.* at 308, 105 S.Ct. at 1292–93. The Court held:

> [i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. *Id.* at 309, 105 S.Ct. at 1293.

The Court concluded that although *Miranda* required the suppression of the unwarned admission, the admissibility of any subsequent statement should turn solely on whether the statement was knowingly and voluntarily made. *Id.*

In determining the voluntariness of the defendant's confession in *Elstad* the Supreme Court considered whether the initial unwarned statement compromised the voluntariness of the subsequent written confession. The Supreme Court distinguished between actual and presumed coercion:

> When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession ... The failure of police to administer *Miranda* warnings does not mean that the statements received have actually

been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. *Id.* at 310, 105 S.Ct. at 1293–94.

*Elstad* involved no actual coercion but presumed coercion due to the *Miranda* violation. In this circumstance, the Court concluded that a thorough administration of *Miranda* warnings served to cure the condition that rendered the initial statement inadmissible. Id. at 310–11, 105 S.Ct. at 1293–94.

The Supreme Court also examined whether the psychological impact of "letting the cat out of the bag" constituted a lingering form of compulsion requiring the suppression of the warned confession. The Court has never held that the psychological impact of voluntary disclosure of criminal activity constitutes state compulsion or compromises the voluntariness of a subsequent informed waiver. *Id.* at 312, 105 S.Ct. at 1294–95. The Supreme Court refused to adopt the Oregon appellate court's expansive view of the Fifth Amendment; the Oregon court's view, the Supreme Court determined, would effectively immunize a suspect, who responds to pre-*Miranda* warning interrogation, from the consequences of any subsequent informed waiver of rights. *Id.* The Court concluded that "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.*

In applying *Elstad* to the case at bar, this court must focus its inquiry on determining when the officers issued *Miranda* warnings in relation to the written confession and whether the confession was coerced. If on the one hand this court finds that the written confession was given during custodial interrogation but pre-*Miranda* warnings, then *Elstad* would not save the confession from suppression. On the other hand, if the court finds that the officers advised the defendant of his rights before he gave the written confession, the court would then need to determine whether the confession was knowingly and voluntarily made.

### a. WHEN WERE MIRANDA WARNINGS ISSUED

The parties in the case at bar tell very different stories about the government's administration of *Miranda* warnings to Bernard Watson on the day in question. Although the prosecution and the defense agree that at some point during the day of September 16, 1993 the officers advised Bernard Watson of his rights, both sides disagree as to the sequence of events surrounding the preparation of the confession, the administration of rights and the waiver of rights. Based upon the record as a whole and the credibility of the witnesses, this court must determine what was the actual sequence of events at the FBI office on September 16, 1993.

*DEFENDANT'S VERSION OF THE EVENTS AT FBI OFFICE*

When the defendant and the officers arrived at the Dirksen Building, the officers continued to question Bernard Watson. (Tr. at 162). Mr. Watson responded to the officers' questions that he did not know about the robbery. *Id.*

In the federal building the police gave Bernard Watson a written statement (Government's Exhibit No. 2—"written confession") and told him that if he signed it he could go home. (Tr. at 163). The defendant claims that he did not provide the officers with the information that appears in the written confession. (Tr. at 164). The officers handed the defendant the written confession already prepared and he signed it. *Id.* The defendant contends that before he signed the confession, the officers had not spoken to him about his right to have a lawyer or his right to remain silent. (Tr. at 165–66). The defendant stated that the only time he discussed having a lawyer with the officers was when they were in the police car at which time he asked for a lawyer and the officers ignored him. *Id. See also* Tr. at 197.

The officers told the defendant that they had picked up his girlfriend to talk to her on the day in question. (Tr. at 167). The defendant asked the officers if he could talk to her. *Id.* After some delay, someone called the defendant's girlfriend and he spoke with her. According to the defendant, he was unable to talk freely or privately with his girlfriend because one of the officers stood directly in front of him and told him what to say. *Id.* The defendant testified that he said to his girlfriend "[h]opefully I will be home shortly, so I love you and I'll see you later." (Tr. at 168).

After the defendant signed the written confession the officers took him to the U.S. Attorney's office to sign more papers. Watson testified that on September 16, 1993, he went the U.S. Attorney's office twice that day. (Tr. at 213). While in the U.S. Attorney's office, the defendant signed a Waiver of Rights form (Government's Exhibit No. 1). (Tr. at 164–65). Afterwards, the police drove the defendant home and arrived at his house about 3:00 p.m.

*GOVERNMENT'S VERSION OF THE EVENTS AT FBI OFFICE*

When the officers and Watson arrived at the FBI office, Agent Hosko spoke with the Assistant United States Attorney assigned to the case. (Tr. at 19). Following that conversation, Agent Hosko asked Watson to provide a written statement of what Watson had already told Hosko and Branum about the robbery and his involvement. (Tr. at 19, 91.). Before the officers and the defendant drafted the written confession, the officers gave Watson an Advice of Rights and Waiver form containing the *Miranda* warnings (Government's Exhibit 1—Tr. at 19–20, 91–92). Agent Hosko asked Watson to read aloud a few lines of the form to determine whether he was literate. (Tr. at 20, 92). Watson read the entire form, told the officers that he understood his rights, and he signed the form. *Id.* Both officers testified that at no time did Watson request an attorney. (Tr. at 21, 92–93).

After Watson signed the waiver of rights form, Agent Hosko and Watson prepared the written confession. (Tr. 93). Agent Hosko reviewed the notes he had made that day and summarized them in writing in what is now known as the defendant's written confession. *Id.* The agent prepared the statement one paragraph at a time in consultation with the defendant to ensure that the statement was accurate. *Id.* Watson requested Agent

Hosko not specify in the written statement the names of others involved in the robbery, including his cousin Carl Dixon. (Tr. at 22, 93). Agent Hosko complied with the request and did not refer by name to Carl Dixon in the statement. (Tr. at 94). Watson signed the statement and placed his initials on the pages. (Tr. at 22–23). While Agent Hosko and Watson drafted the statement, Detective Branum left the office and brought back lunch for the three of them. (Tr. at 23). The three had lunch after Watson and Agent Hosko completed the statement and Watson signed it. *Id.*

Agent Hosko then called the Assistant United States Attorney assigned to the case and went in person to see him to discuss Watson's cooperation. In the interim, the defendant called his girlfriend in Detective Branum's presence. (Tr. at 23). The detective heard Watson tell his girlfriend that he was in some trouble with the police. Watson reportedly also said to her "[n]o, I'm not arrested" and "[y]es, I will be home tonight, but I don't know what time" or "I will be home later but I don't know what time." (Tr. at 24).

When Agent Hosko returned to the office in which Watson and Branum were; Hosko informed Watson that he had told the Assistant U.S. Attorney on the case of Watson's cooperation. (Tr. at 94). Agent Hosko testified about the following events. Reportedly, the Assistant U.S. Attorney proposed that Watson memorialize his cooperation in an agreement and Watson agreed. *Id.* Agent Hosko and Bernard Watson then went to the U.S. Attorney's office. (Tr. at 95). Mr. Watson asked the Assistant U.S. Attorney about the length of jail time he was potentially facing for his involvement in the robbery. *Id.* The Assistant U.S. Attorney described the Sentencing Guidelines and the potential effect of his cooperation. *Id.* The Assistant U.S. Attorney, Agent Hosko and Bernard Watson reviewed a cooperation agreement that was drafted by the U.S. Attorney's office and all three signed the agreement. (Government's Exhibit 4—Tr. at 95–97) Afterwards, Agent Hosko and Detective Branum drove Bernard Watson home between 2:30 and 3:00 p.m. (Tr. at 24).

This court notes for the record that much of Agent Hosko's testimony about statements made by the Assistant U.S. Attorney was incompetent evidence because it was hearsay. The hearsay is almost disguised because of the way in which the testimony was presented. The Assistant United States Attorney, who was a witness to key events on the day in question, posed leading questions to Agent Hosko on direct examination about what the Assistant United States Attorney said in his office on September 16, 1993. (Tr. at 95). The synergy of leading questions and hearsay amplify the need for the prosecutor here to have testified as a sworn witness about events known to him. Such a presentation of testimony could lull even a good defense attorney into failing to object. In this case, objections were not necessary since this was a bench hearing for which the court was capable of recognizing evidentiary problems.

The diverging versions of events surrounding Watson's confession compel this court to assess the credibility of the witnesses and their testimony to determine the actual sequence of events at the Dirksen Building on September 16, 1993. The time at which the defendant received *Miranda* warnings is an important fact bearing on the issue of whether to suppress Watson's written confession. To resolve this issue, we turn to the officers' testimony surrounding the issuance of *Miranda* rights since the government has the burden of proof. *See Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1628.

Detective Branum testified that the officers advised Watson of his rights under *Miranda* before Watson helped prepare the written confession. The sequence of questions and answers on Detective Branum's direct examination is critical:

Q. When you arrived at the FBI offices, did Agent Hosko have a conversation with the Assistant assigned to this case?

A. Yes, he did.

Q. And as a result of that conversation, what did Agent Hosko asked [sic] Mr. Watson to do?

A. He asked him to provide us with a written statement of what he had previously told us.

Q. And was that process begun?

A. Yes, it was.

Q. Now, prior to taking down any written statement, was Mr. Watson given any warnings?

A. Yes he was.

Q. And what kind of warnings was he given?

A. It's the Miranda warnings.

Q. And how is that done?

A. From a preprinted FBI form.

Q. And did Mr. Watson execute the form?

A. Yes, he did. (Tr. at 19–20).

Agent Hosko's testimony on this issue confirms Detective Branum's testimony about the administration of *Miranda* warnings. On direct examination, Hosko testified as follows:

Q. You came up—you're in your office now. What happened at that point?

A. I spoke to Mr. Watson about taking a signed statement, which was to in effect memorialize—it's a summary of what we had already talked about.

Q. And prior to that, did you advise him of certain rights?

A. Yes, I did.

Q. I'm going to show you what's been admitted as Government Exhibit 1 and ask you if you recognize this?

THE COURT: You mean immediately prior to that?

BY MR. KRULEWITCH:

Q. Immediately prior, prior to taking any written statement?

A. Prior to taking any written statement.

Q. While you were in the office.

A. Yes, sir. This is apparently a copy of the signed Advice of Rights and waiver form that I used that day. (Tr. at 91–92).

As an initial matter, this court notes the prosecution's continuous use of leading questions during the direct examination of both its witnesses. A question is leading if it suggests the particular response desired by the examiner. Glen Weissenberger, *Federal Evidence* § 611.6, at 260 (1987). Leading questions are disfavored on direct examination where the witness supports the party calling that witness; the concern is that leading questions encourage the witness to acquiesce in the version of events stated in the examiner's questions rather than to describe the occurrence of events as the witness recalls them. *Id.*

■ In the case at bar, the leading questions posed by the prosecutors on their direct examinations impugn the credibility of their witnesses. Detective Branum stated in his own words that as soon as they arrived at the FBI office, Agent Hosko talked to the Assistant U.S. Attorney on the case, he asked Watson for a written statement and they began preparing that statement. Until that point in his description, Detective Branum had not mentioned *Miranda* warnings. The prosecutor then asked a very leading and suggestive question: "Now, prior to taking down any written statement, was Mr. Watson given any warnings?" (Tr. at 20). This question is leading because it states the prosecution's version of the sequence of events surrounding the administration of *Miranda* rights and prompts the answer that the government seeks. The witness's answer of "[y]es, he was" corroborates the prosecutor's version of events rather than articulating the events as the witness remembered them. This type of suggestive questioning hampers the court from hearing the witnesses' version of events and, at least to some extent, undermines the testimony of the witness.

The testimony of Agent Hosko about the confession also suffers from the same credibility problem as Detective Branum's. Agent Hosko testified that when he, Detective Branum and Watson arrived at the Dirksen Building, Hosko talked to Watson about giving a written statement. Up until that point in his answer, Hosko did not mention giving *Miranda* warnings. The prosecution then asked a very leading and suggestive question: "And prior to that, did you advise him [Watson] of certain rights?" (Tr. at 91).

This question indicates the prosecution's theory of the sequence of events and prompts the witness' answer. Agent Hosko's answer of "[y]es I did" confirms the government's version of events but does not indicate the witness' independent recollection of the sequence of events. As with Detective Branum, Agent Hosko's testimony about the administration of *Miranda* warnings seems to reflect the government's theory rather than express Hosko's own recollection of events that day.

This court notes for the record that both Detective Branum and Agent Hosko were consistent in their testimony surrounding the administration of *Miranda* warnings. What is interesting is that both officers stated that as soon as they arrived at the Dirksen Building, they talked to Watson about him giving them a written statement and they began preparing the statement. It was not until the government prompted both witnesses with suggestive questions that the witnesses mentioned *Miranda* warnings at all.

The record reflects a discrepancy concerning the time at which Watson received his *Miranda* warnings, waived those rights and signed his confession. Agent Hosko testified that on September 16, 1993 he administered the *Miranda* warnings to Watson at 11:23 a.m., that Watson waived those rights at 11:30 a.m., and that Watson signed his confession at 12:26 p.m. (Tr. at 228–29). Bernard Watson testified that he signed the confession in front of Agent Hosko but no time was written on the confession when he signed it. (Tr. at 206). The defendant also testified that after he signed the confession he went to the office of the Assistant United States Attorney ("AUSA"). (Tr. at 164–65). Watson also stated that the AUSA, the very one who conducted the hearing on the motion to suppress, gave him to sign the Waiver of Rights form containing *Miranda* warnings while he was in the AUSA's office. (Tr. at 220, 164–65). That AUSA placed the time that Watson arrived at his office after 1 p.m. *Id.* On cross examination of Watson, the AUSA phrased his question to incorporate the following facts:

Q. Mr. Watson, solely what I'm talking about right now is just the Waiver of Rights form, Government Exhibit 1, okay? Now, you indicated you signed that document, correct? You just testified to that right?

A. Yes.

Q. And you signed that in my office, right?

A. Yes. (Tr. at 223).

Even if we assume *arguendo* that Watson signed his written confession at 12:26 p.m., there remains a serious discrepancy regarding the time at which he received *Miranda* warnings and he waived those rights. Either Bernard Watson signed the Waiver of Rights form containing the *Miranda* warnings in the AUSA's office after 1 p.m., as Watson testified and the AUSA indicated, or Watson received his warnings and signed the form by 11:30, as the document indicates and Agent Hosko testified.

This court spent a great deal of time analyzing the credibility of the witnesses who testified at the hearing. After a lengthy review of the record, we find that the presentation of evidence at the hearing was disturbing. The testimony of the government's witnesses has been sullied, in part, by the government's excessive use of leading, suggestive and compound questions on direct examination. We found Bernard Watson's testimony to be credible. Watson's answers were clearly spontaneous, direct and unfeigned. In addition, his answers were notably not always self-serving. This motion to suppress requires a careful evaluation of the testimony, credibility determinations, and a difficult call on the part of this court.

The government has the burden of proof here to demonstrate that Watson waived his *Miranda* rights before he incriminated himself during his custodial interrogation. *See Miranda,* 384 U.S. at 444, 475, 86 S.Ct. at 1612, 1628. The discrepancy in the record concerning the time at which the *Miranda* warnings were given and executed compels this court to rule that the government has not sustained its burden of proof. Consequently, *Miranda* requires this court to suppress the written confession and *Oregon v. Elstad, supra,* does not dictate otherwise.

This court is further troubled by the actions of the government and, to a lesser extent, the defense counsel at the hearing. The questioning of witnesses by the AUSA about the execution of *Miranda* rights and waiver implies that he knew or should have known he was a witness to the procedure. In addition, the AUSA attempted to testify not as a sworn witness but through his questioning of witnesses. The court alerted the AUSA to the problem:

> You have just said "Didn't I say something to you?" You put your credibility on the line too, and if you do that, you better be under oath. You shouldn't mittle [sic] the judge. I don't want to say "Well, [the AUSA] isn't telling the truth" if indeed I should decide the other way, should I? I shouldn't be put in that position. Advocates have a way of understanding and interpreting things from the perspective they know and remember, and it's true, the best people in the world when they're developing facts have a way of interpreting and understanding the way they perceive and recall ... but the problem is in the purity of the effort to have a truth finding, factfinding, you shouldn't as a lawyer, especially as a prosecutor put your credibility or your opinion or your recall of facts in issue. And that's what you just did. *Id.*

We note for the record that on one occasion during the hearing the defense counsel and the government argued over facts not testified to by any sworn witness. (Tr. at 270–72). We recognize that the lawyers responded to questions posed by the court. Nonetheless, when lawyers interject as advocates rather than as sworn witnesses facts outside of the record, they create significant difficulties for the court.

By confounding the roles of lawyer and witness, a lawyer runs the risk of violating the Code of Professional Responsibility. The Rules of Professional Responsibility for the Northern District of Illinois prohibit a lawyer from litigating in a case in which the lawyer knows or reasonably should know that the lawyer may be called as a witness on behalf of the client except in limited circumstances. *See* Rule 3.7 of the Rules of Professional

Conduct for the Northern District of Illinois (1991).

We mention these problems not to berate the lawyers, all of whom the court believes are fine individuals and good attorneys. We conclude that the mistakes made here were unwise but not worthy of sanctions. We believe that a stern warning to the lawyers is appropriate. We raise these issues to point out serious mistakes that we see all too often in this court in the hopes that they will not be repeated in the future.

Since this court has concluded that the government violated the rights of the defendant as outlined by *Miranda*, we must suppress the oral and written statements. We need not reach the issue of whether Watson's confession was coerced in violation of the Fifth Amendment.

We also note that the timing of the confession also bears on whether it was given in accordance with 18 U.S.C. § 3501 governing the use of confessions in federal criminal prosecutions. Title 18 § 3501(c) establishes guidelines on the use of confessions given by persons within six hours of the time that their custody commences. *See also United States v. Alvarez-Sanchez,* —— U.S. ——, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). The attempts by the government in this case to get in evidence through frequent leading and suggestive questions on direct examination and unconvincing testimony of witnesses concerning the timing of the documents reflects negatively on this issue as well. Since this court suppresses the confession under *Miranda*, we need not reach the issue of whether the confession was given in accordance with 18 U.S.C. § 3501.

### III. *MIRANDA AND SIXTH AMENDMENT ISSUES*

██ The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." United States Constitution, Amendment VI. The Sixth Amendment's right to counsel attaches only at the initiation of adversarial criminal proceedings. *See United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297–98, 81 L.Ed.2d 146 (1984).

■ In addition to the Sixth Amendment right to counsel, the United States Supreme Court held in *Miranda, supra,* that a suspect subject to custodial interrogation also has the right to counsel. 384 U.S. at 470, 86 S.Ct. at 1625–26. The Court in *Miranda* held that a suspect who is subjected to custodial interrogation has the right to consult an attorney, have counsel present during questioning, and have these rights explained to him before questioning by law enforcement begins. *Id.* at 469–73, 86 S.Ct. at 1625–27. An unambiguous request for counsel by a suspect pursuant to *Miranda* constitutes a *per se* invocation of his Fifth Amendment rights. *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979), *reh'g. denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979).

■ If a suspect requests counsel at any time during custodial interrogation, law enforcement must cease questioning until the suspect consults with his attorney or the suspect re-initiates conversation with the officers. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), *reh'g. denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *see also Miranda, supra,* 384 U.S. at 474, 86 S.Ct. at 1627–28. When a suspect invokes his right to have counsel present during custodial interrogation, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards, supra,* 451 U.S. at 484, 101 S.Ct. at 1885. If a suspect effectively waives his right to counsel after receiving the *Miranda* warnings, however, the government is free to question the suspect. *North Carolina v. Butler,* 441 U.S. 369, 372–76, 99 S.Ct. 1755, 1756–59, 60 L.Ed.2d 286 (1979). The Supreme Court has explained that the right to counsel rule under *Miranda* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990).

■ The application of this rule requires courts to determine initially whether an accused actually invoked his right to counsel. *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984) (per curiam). To avoid problems of proof and provide guidance to officers, courts must make an objective inquiry. *See Connecticut v. Barrett,* 479 U.S. 523, 528–30, 107 S.Ct. 828, 831–33, 93 L.Ed.2d 920 (1987). To invoke the *Miranda* right to counsel, a suspect subject to custodial interrogation must make a clear and unambiguous expression for the assistance of counsel. *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994).

This case raises several issues concerning the right to counsel. One issue is whether the officers improperly denied the defendant of his right to counsel during the time that he was subjected to custodial interrogation. A second issue concerns a cooperation agreement that the defendant entered into with the government on September 16, 1993.

## A. RIGHT TO COUNSEL

■ At the suppression hearing there was contradictory testimony given about whether the defendant requested counsel on September 16, 1993. Bernard Watson testified that during the car ride he asked to speak to an attorney but the officers ignored him. (Tr. at 161, 197). The government witnesses denied that Watson made any such request or that the officers told Watson not to get an attorney. (Tr. at 24, 104–05, 109).

Since the witnesses differ on their recollection of events surrounding an alleged request for counsel, the court must examine and weigh the credibility of the testimony. Watson testified on direct examination that after he and the officers left the Green Street station, Watson thought that he was going home so that he could go to work. (Tr. at 161). Watson claimed that when he noticed that the officers were not driving him in the direction of his home, he asked if he was under arrest; reportedly, the officers said that he was not under arrest. *Id.* Watson testified that he then asked if he could go home and the officers said no. *Id.* Then Watson maintains that he said "I would like an attorney" but the officers ignored him. *Id.*

Bernard Watson told the very same story under stern cross examination as he did on direct examination as to the events in the car. Watson testified that he asked for an attorney only once that day. The defendant told his story about the request for counsel on direct and cross examination apparently without embellishing on the facts. In light of the defendant's consistency, demeanor and the unreliability of testimony of the government's witnesses as expressed earlier in this opinion, we find that Bernard Watson made a clear and unequivocal request for counsel while in the car and the officers ignored his request.

Since Bernard Watson was subjected to custodial interrogation throughout the day in question, *Miranda* required the officers to cease their questioning but they did not, as explained earlier in this opinion. The government presents no credible evidence to show that Bernard Watson initiated conversations with the officers such that he waived his right to counsel. In fact, the evidence shows that Agent Hosko and Officer Branum continued their questioning of Watson all morning on the day in question. Consequently, the *Miranda* doctrine regarding the right to counsel requires this court to suppress all incriminating statements that Watson made from the car ride on, including the statements made on the way to and at the crime scene as well as the written confession.

## B. COOPERATION AGREEMENT

On September 16, 1993, Bernard Watson signed an agreement to cooperate with the government in their investigation of the armored car robbery. Originally, the defendant did not request this court to suppress the cooperation agreement along with his oral and written statements. During the hearing, however, the defendant objected to the government's attempt to admit the cooperation agreement (Exhibit 4) as evidence that Watson made his inculpatory statements voluntarily. (Tr. at 97–104) The court sustained the objection; this court held that events occurring after Watson gave his written confession are irrelevant in determining whether Watson confessed voluntarily. *Id.*

The defendant subsequently conceded that the cooperation agreement should be admitted as limited evidence solely on the issue of whether that agreement coerced the defendant into giving up his right to counsel. *Id.* at 280. The defendant asserted in closing argument that the language of the agreement puts the defendant in an unenviable position of having to trade basic rights—the right to counsel and the right to remain silent—for his immediate freedom. (Tr. at 284). According to the defendant, the cooperation agreement suggests that as long as the defendant did not exercise his right to counsel and continued to cooperate with law enforcement, he would be free to go home. *Id.* at 282–84. The court allowed the cooperation agreement in as limited evidence solely for the purpose of determining whether the agreement pressured the defendant into giving up his right to counsel. *Id.* at 280–81.

The government asserts that this cooperation agreement is proper even when offered to a suspect who is unrepresented by counsel. (Govt's Supplemental Br. at 5). The court agrees that the government is entitled to solicit cooperation from a suspect. The government cites *United States v. Knott,* 912 F.2d 467 (7th Cir.1990), *aff'd,* 19 F.3d 21 (7th Cir.1994) to demonstrate that law enforcement frequently uses cooperation agreements. Although the defendant in *Knott* signed a cooperation agreement, the Seventh Circuit's opinion does not discuss the contents of that agreement nor does it examine whether, as in *Watson,* the agreement contains language that may be inherently coercive. Furthermore, *Knott,* 912 F.2d 467, is an unpublished opinion. Seventh Circuit Rule 53(b)(2) provides that parties may not cite or use as precedent unpublished orders except to support a claim of *res judicata,* collateral estoppel or law of the case in any federal court within the circuit. The government improperly cited *Knott* to this court in violation of rule 53(b)(2).

The other cases that the government cited, *United States v. Rutledge,* 900 F.2d 1127 (7th Cir.1990), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990) and *United States v. Harris,* 914 F.2d 927 (7th Cir.1990), indicate that when law enforcement seeks the cooperation of a suspect the officers must operate within certain boundaries. The Seventh Circuit explained in *Rutledge* that when seeking a confession from a suspect, "[t]he police are allowed to play on a suspect's

ignorance, his anxieties, his fears, and his uncertainties; they are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." 900 F.2d at 1130. The government may not seek the cooperation of a suspect at the expense of his or her constitutional, statutory, or court-created rights.

■ The government asserts in its brief that law enforcement may solicit cooperation from an unrepresented defendant. (Gov't's Supplemental Br. at 5). The government argues that Bernard Watson's right to counsel did not attach when the cooperation agreement was discussed because at that time the government had not initiated adversarial judicial criminal proceedings against him. The government's argument misses the point. The government offers a Sixth Amendment argument but the issue the court is currently addressing concerns the right to counsel under *Miranda* and the right against self-incrimination under the Fifth Amendment.

The right to counsel under the Sixth Amendment attaches at the initiation of adversarial criminal proceedings. *See United States v. Larkin,* 978 F.2d 964, 969 (7th Cir.1992), *cert. denied, Larkin v. United States,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Whether Bernard Watson's right to counsel pursuant to the Sixth Amendment had accrued at the time he signed the cooperation agreement is not the issue. The issue currently before the court is whether the government's cooperation agreement coerced Bernard Watson into giving up the right to counsel that *Miranda* provides. As we discussed already at great length in this opinion, Bernard Watson's right to counsel pursuant to *Miranda* attached when Agent Hosko and Officer Branum subjected him to custodial interrogation. The government's Sixth Amendment argument is unresponsive to the issue at bar.

■ The government's final argument concerning the cooperation agreement is that even if Watson's right to counsel had attached, he waived his right to counsel by executing the Waiver of Rights form. (Gov't's Supplemental Br. at 5). Even if we assume *arguendo* that the defendant validly waived his right to counsel by executing the Waiver of Rights form, that is not dispositive. *Miranda* not only provides that anyone subject to custodial interrogation may waive the prophylactic rights but *Miranda* also provides that such individuals have the right to revoke their waiver of rights at any time. 384 U.S. 444–45, 86 S.Ct. at 1612–13. As we explain below, the problem with the cooperation agreement that the government used in the case at bar is that it implies that the defendant did not have the right to revoke his waiver at any time. In other words, if Bernard Watson wanted to remain out of jail, he had to provide the authorities with more information about the robbery and not contact a lawyer. This cooperation agreement is inherently coercive and vitiates the rights established by *Miranda.*

This court finds that the language of the cooperation agreement is coercive in a very subtle and sophisticated way. The cooperation agreement states in relevant part the following:

> You have agreed to cooperate in the investigation of the armored car robbery and to provide complete and truthful information to the FBI in conjunction with their investigation ...
>
> ... You also acknowledge that you are not seeking the assistance of counsel at this time and are willing to cooperate with the FBI on the basis of this agreement.
>
> . . . .
>
> You further agree to remain within the Chicagoland area to immediately notify the FBI if you intend to travel outside the Chicago area ...

The language that this court finds troubling is the second paragraph cited here, especially when taken in light of the first paragraph. The first paragraph mentions the defendant's willingness to provide law enforcement with more information about the armed robbery. Curiously, the second paragraph declares that the defendant did not have an attorney on September 16, 1993. The second paragraph then restates that Watson was "willing to cooperate with the FBI on the basis of this agreement."

The language of the second paragraph may be interpreted in at least one of two ways. On the one hand, the second paragraph reit-

erates the defendant's willingness to provide the authorities with more information about the robbery. If that is so, then there would be no need to insert that last phrase regarding Watson's cooperation with the FBI because the first paragraph expresses the same idea. On the other hand, the wording of the second paragraph insinuates that part of the defendant's cooperation includes his continued willingness not to exercise his right to counsel. The court questions the government's reason for stating in the same sentence that the defendant was unrepresented by counsel on September 16, 1993 and that he was willing to cooperate "on the basis of this agreement." One may fairly infer from the ambiguous language of the second paragraph that not exercising one's right to counsel was a condition subsumed within the cooperation agreement.

When taken as a whole, we believe that the cooperation agreement coerced the defendant *into continuing to give up his right to counsel* in violation of *Miranda.* The agreement intimates that as long as the defendant failed to exercise his right to counsel and supplied the authorities with more information about the robbery, Bernard Watson would be allowed to leave the Dirksen Building and return home on the afternoon of September 16, 1993. We hold that such coercion by the government is impermissible.

The court further notes that the condition of the cooperation agreement to limit travel is also coercive as a restraint on the defendant's constitutional freedom.

One remaining issue that is not dispositive of this motion to suppress but is of concern to the court *is whether the conduct of the law* enforcement officers complied with Federal Rule of Criminal Procedure 5(a). That rule establishes a duty to present an arrestee without unnecessary delay to a federal magistrate or an otherwise authorized judicial officer. Fed.R.Crim.Pro. 5(a). This duty arises not only when law enforcement officers formally arrest a suspect for a federal crime but also when they restrain a person's freedom to the degree associated with an arrest. *See Alvarez–Sanchez, supra,* —— U.S. at ——, 114 S.Ct. at 1604.

The government was under a duty to present Watson without unnecessary delay to a magistrate pursuant to Federal Rule of Criminal Procedure 5. As we held in this opinion, Watson was "in custody" from the time Officer Branum and Agent Hosko picked Watson up at his home. The record indicates that law enforcement waited several days after September 16, 1993 to arrest Watson but the record does not mention when the police presented Watson before a magistrate. We want to give the parties an opportunity to address this important issue in court.

### CONCLUSION

For the reasons explained above, this court grants the defendant's motion to suppress the oral and written statements that Bernard Watson made on September 16, 1993. Consequently, we need not reach the issue of whether this court must suppress the defendant's incriminating oral and written statements because of alleged violations of rights guaranteed by the Illinois Constitution. We also hold that the cooperation agreement into which Bernard Watson and the government entered was coercive.